ROBERT S. ADDISON, JR. (SBN: 188565)
  mcramer@buchalter.com
MATTHEW L. SEROR (SBN: 235043)
  mseror@buchalter.com
BUCHALTER, A Professional Corporation
1000 Wilshire Boulevard, Suite 1500
Los Angeles, CA 90017-2457
Telephone: (213) 891-0700
Fax: (213) 896-0400

Attorneys for Plaintiff
ARBOR SNOWBOARDS, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARBOR SNOWBOARDS, INC. a California corporation,<br><br>　　　　Plaintiff,<br><br>　vs.<br><br>BRAVO SECTOR 9, LLC, a California limited liability company; EASTERN SKATEBOARD SUPPLY, INC., a North Carolina corporation,<br><br>　　　　Defendants. | Case No.<br><br>**COMPLAINT FOR:**<br><br>**(1) TRADEMARK INFRINGEMENT;**<br>**(2) DILUTION; and**<br>**(3) COMMON LAW TRADEMARK** |

Plaintiff Arbor Snowboards, Inc. ("Plaintiff") for its Complaint against Defendants Bravo Sector 9, LLC ("Bravo") and Eastern Skateboard Supply, Inc. ("Eastern") alleges as follows:

### Nature of the Action

1.　　Plaintiff alleges three causes of action against Bravo and Eastern: Willful trademark infringement pursuant to 15 U.S.C. Sec. 1117 *et seq.* (Count I); Dilution (Count II); and Common law trademark infringement (Count III).

///

///

///

## Jurisdiction & Venue

2. This Court has subject matter jurisdiction over this Complaint pursuant to the Lanham Act, 15 U.S.C. §§ 1051 *et seq.*

3. This Court has personal jurisdiction over Bravo insofar as it does business within this judicial district and maintains a principal place of business at 12801 Carmenita Road, Santa Fe Springs, California.

4. This Court has personal jurisdiction over Eastern insofar as it does business within this judicial district. Specifically, Plaintiff is informed and believes, and on that basis alleges, that Eastern purchased the infringing goods from Defendant Bravo and, in so doing, has engaged in business within this judicial district. Moreover, Eastern operates an e-commerce website and, therefore, markets products for sale within this judicial district.

5. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Bravo resides in this judicial district.

## The Parties

6. Arbor is a California corporation organized and existing under the laws of the State of California. Arbor is located at 102 Washington Blvd, Venice, California, 90292.

7. Arbor is informed and believes, and on that basis alleges, that Bravo is a California limited liability company organized and existing under the laws of the State of California with a principle place of business is located at 12801 Carmenita Road, Santa Fe Springs, California.

8. Arbor is informed and believes, and on that basis alleges, that Eastern is a North Carolina corporation organized and existing under the laws of the State of North Carolina with a principle place of business located at 6612 Amsterdam Way, Wilmington, NC 28405.

///
///

## The Arbor Brand

9. Arbor is world famous designer, manufacturer, licensor and retailer of high-end snowboards, skateboards and related apparel. Arbor's designs and products are unique and innovative and are overwhelming popular both in the United States and internationally. Arbor has been at the forefront of the industry and has set market and design trends.

10. Arbor has spent over twenty years developing its brand, identity and goodwill as a producer of premium, high-end products. The management and control of its brand and identity are of the utmost importance to Arbor.

11. Arbor has several categories of licensed products. Arbor's success is in part due to effectively managing the multiple categories of products it sells and all of its associated licenses. It is this brand management focus which has preserved a consistent presentation of Arbor products (and its trademarks) and the goodwill associated therewith across Arbor's various products categories.

12. Arbor does a few things to ensure the presentation of a consistent message and brand across its product categories. First, it utilizes a shared art department to ensure consistency in the look and aesthetic of the Arbor brand. Second, it maintains a shared facility. Third, the use of a shared distribution network, as shared across the board by all entities manufacturing and selling goods under the Arbor brand. Finally, Arbor review and approves pre-production samples of licensed products before they are shown or offered for sale. Every license agreement entered into by Arbor solidifies these principles, and others, in order to protect and preserve the brand.

13. The foregoing principles have also fueled Arbor's image as a premium brand and contributed greatly to its success and the substantial goodwill it enjoys.

///
///
///

**The Arbor Trademarks**

14. Arbor owns all rights in and to a family of ARBOR trademarks, service marks, logos and trade names (the "Arbor Marks"). A number of the Arbor Marks are protected by federal trademark registrations owned by Arbor, including:

    a. ARBOR, registered trademark number 3042124, registered January 10, 2006 by Arbor (this registration is now incontestable);

    b. ARBOR, registered trademark number 4436423, registered November 19, 2013 by Arbor;

    c. THE ARBOR COLLECTIVE, registered trademark number 4450611, registered December 17, 2013 by Arbor;

    d. ARBOR, registered trademark number 4648532, registered December 2, 2014 by Arbor;

    e. ARBOR AND TREE DESIGN, registered trademark number 4954048, registered May 10, 2016 by Arbor.

15. In addition to the foregoing, Arbors owns several foreign trademark registrations for its ARBORS trademarks for snowboards, skateboards and/or apparel and related goods, including registrations in Argentina; Australia; Canada; Chile; China; Japan; the Republic of Korea; Switzerland; the Russian Federation; the United Arab Emirates and in the European Union.

16. The Arbor Marks are famous and well-known to consumers and are distinctive.

**The Master License Agreement**

17. On or about January 5, 2007, Arbor (as licensor) entered into a License Agreement (the "License") with Sector 9, Inc. (as licensee) pursuant to which it would manufacture and sell a variety of goods, including but not limited to complete skateboards, skateboard decks, loose skateboard wheels, bearings, trucks, hardware, risers, bushings, and grip tape. The goods to be manufactured and sold pursuant to the License would bear the Arbor Marks, included related designs,

logos, trademarks, service marks, trade names, copyrights and merchandising rights then owned, or later acquired by Arbor.

18. On or about July 1, 2008, Sector 9, Inc.'s interest under the License was assigned to Burleigh Point, Ltd.

19. On or about July 1, 2016, Burleigh Point, Ltd.'s interest in the License was assigned from Burleigh Point, Ltd. to Bravo. Pursuant to the assignment, which Bravo executed, Bravo acknowledged and agreed to be bound by the terms of the License.

20. The License had a term running from January 5, 2007 through December 31, 2011 and would be automatically renewed for two subsequent three year terms.

21. Under the terms of the License, the licensee (now Bravo) was obligated to pay Arbor a royalty on licensed products sold pursuant to the License. The License also set minimum sales thresholds that the licensee (now Bravo) was obligated to meet.

22. In conformity with Arbor's focus on brand consistency and image, the License also included provisions detailing the specific sales and distribution channels through which products sold under the License could be sold.

23. The License required all domestic (United States and Canada) sales made pursuant to the License to be made through a common distribution network of domestic based sales representatives. The License precludes domestic sales through other channels, including through the use of distributors in the United States, without the approval of Arbor. Any additions to the sales or distribution channels, or to the distribution strategy, required the express approval of Arbor.

24. The License required all international sales made pursuant to the License to be made through approved distributors. Attached as Schedule B to the License was a list of all authorized sales representatives and distributors that were

permitted under the License. Any additions to the sales or distribution channels, or to the distribution strategy, required the express approval of Arbor.

25. As set forth herein, the sales and distribution strategy set forth in the License was implemented to ensure brand consistency across various product categories, to maintain high-quality goods and services and the goodwill of the Arbor Marks. In addition, by maintaining a common distribution network, Arbor could ensure that its products are being sold through higher-end retailers, thereby solidifying Arbor as a premium brand, avoiding brand dilution and avoiding damage to the brand.

## Defendants' Infringing Activity

26. In or about December 2016, Arbor learned that Bravo was considering selling Arbor licensed products to Eastern and another European based distributor.

27. Thereafter, Arbor sent Bravo a letter reminding it of the sales and distribution channels provisions of the License. Arbor stressed the importance of the shared distribution network that Arbor had cultivated and the purposes behind it. But Arbor's response was by no means the final word on the issue, and it invited Bravo to provide additional information as to the reasons why Bravo felt it would be appropriate to add Eastern as a distributor under the License. Bravo never provided any additional information to Arbor on this point.

28. In January 2017, after being told that Eastern was not approved as United States distributors of Arbor products sold under the License, Bravo nevertheless sold substantial units of Arbor products to both Eastern and Ultimate Distribution, another unapproved distributor based in Canada ("Ultimate") for eventual sale to consumers.

29. Arbor is informed and believes, and on that basis alleges, that the sales to Eastern and Ultimate were made by Bravo in an attempt to meet its minimum sales requirement under the terms of the License and were undertaken in reckless disregard for the harm such sales would cause Arbor.

30. Arbor is informed and believes, and on that basis alleges, that following their respective purchase of unauthorized Arbor products from Bravo, Eastern and Ultimate began selling, and are continuing to sell, unauthorized Arbor products. Indeed, the unauthorized Arbor products are featured prominently on the Eastern website and being offered for sale thereon.

31. On February 13, 2017 counsel for Arbor communicated with Reggie Barnes, a representative of Eastern. In that communication, Arbor put Eastern on notice of the pending dispute between Arbor and Bravo. The communication also put Eastern on notice of Arbor's interest in the Arbor's Marks and reserved Arbor's rights with respect to the purchase or sale of any unauthorized Arbor products. No response was received from Eastern.

32. On March 1, 2017, counsel for Arbor sent cease and desist letters to Eastern and Ultimate. The letters indicate that the License permits the sale of Arbor product only through authorized distribution channels, and notes that neither Eastern or Ultimate are authorized distributions of Arbor products. As a result, Arbor demands that Eastern and Ultimate immediately cease selling all unauthorized Arbor products. As of the filing on this compliant, no response has been received from either Eastern or Ultimate and it is believed both are still selling the unauthorized Arbor products.

33. Bravo's sale of unauthorized Arbor products to Eastern and Ultimate occurred **after** Bravo had been told that any sales of Arbor products to Eastern or Ultimate would be unauthorized sales.

34. Eastern and Ultimate's continued sales of unauthorized Arbor products has continued once each was put on notice as to Arbor's rights and the unauthorized sale of the products to each.

35. In addition to the foregoing, Bravo infringed the Arbor Marks by designing, manufacturing, offering for sale and selling unapproved goods.

///

## Count I

(Trademark Infringement and Unfair Competition pursuant to the Lanham Act, 15 U.S.C. Sec. 1117 et seq.)

36. Arbor repeats and incorporates by reference the allegations contained in Paragraphs 1 through 35 as if fully set forth herein.

37. Arbor uses the Arbor Marks in connection with the sales of goods and the offering of services.

38. Pursuant to the term of the License, Bravo was entitled to use Arbor's trademarks only in the manner set forth in the License.

39. Bravo was fully aware, and therefore had actual notice, of the Arbor Marks, and Arbor's rights therein, pursuant to the License.

40. Bravo willfully sold Arbor products to Eastern and Ultimate in violation of the terms of the License.

41. Neither Eastern nor Ultimate are authorized distributors under the License.

42. At the time Bravo sold licensed goods to Eastern and Ultimate, Bravo knew that the sale of Arbor products to these entities was outside the scope of the License and not authorized by Arbor.

43. Eastern was aware of Arbor's rights in the Arbor Marks, and the unauthorized nature of its purchase and re-sale of Arbor products on March 1, 2017, if not earlier.

44. Because Bravo's sale of Arbor products to Eastern and Ultimate are not authorized by the License, and in fact were specifically restricted, these sales constitute trademark infringement.

45. Arbor is informed and believes, and on that basis alleges, that the unauthorized goods sold by Bravo to Eastern and Ultimate (that were subsequently re-sold by Eastern and Ultimate) bore trademarks that were identical to the Arbor Marks.

46. Bravo and Eastern's use of the Arbor's Marks in connection with the sale of unauthorized products is likely to cause confusion in the marketplace, cause mistake or deceive Arbor's retail customers who have come to rely upon Arbor's distribution and sales strategy to ensure brand consistency and that Arbor products are only sold at high-end, quality retailers.

47. Bravo and Eastern's conduct infringes on Arbor's rights in the Arbor Marks.

48. By virtue of being put on notice that the sale of Arbor products from Bravo to Eastern and Ultimate was not authorized, the infringement of Bravo and Eastern was willful and intentional and undertaken without regard for the harm such sales would cause Arbor.

49. Arbor seeks damages from this Court on the grounds that Bravo and Eastern have infringed on the Arbor Marks.

## Count II

(Dilution)

50. Arbor repeats and incorporates by reference the allegations contained in Paragraphs 1 through 49 as if fully set forth herein.

51. Bravo and Eastern's sale of unauthorized Arbor products dilutes the famous and distinctive Arbor Marks and brand.

52. Insofar as Bravo and Eastern's acts of dilution occurred in or about January 2017, they occurred well after Arbor's Marks because famous.

53. The acts of Bravo and Eastern as alleged herein harms the Arbor Marks and brand by impairing the distinctiveness of the Arbor Marks and diluting the brand in the marketplace by oversaturating it.

54. Bravo and Eastern's conduct, including the selling of Arbor products through the unauthorized channels described herein, harms the reputation of the Arbor Marks and brand by allowing Arbor products to be sold through distribution channels different from the higher-end channels that Arbor products are usually

sold through and associated with. Arbor has taken steps over the last twenty years to preserve the integrity of its distribution and sales strategy for the benefit of the brand, and Bravo and Eastern's conduct undermines and thwarts that effort.

55. Arbor has sustained, and will continue to, sustain damages as a result of the acts of dilution caused by Bravo and Eastern's sales of unauthorized Arbor products.

56. Arbor seeks damages from this Court on the grounds that Bravo and Eastern are diluting the value of the Arbor Marks and brand.

### Count III

(Common Law Trademark Infringement)

57. Arbor repeats and incorporates by reference the allegations contained in Paragraphs 1 through 56 as if fully set forth herein.

58. Arbor uses its Arbor Marks to conduct its business and to sell its various categories of products.

59. Arbor's use of the Arbor Marks is nationwide, as Arbor products are marketed, offered for sale and sold across the United States (and internationally).

60. Bravo and Eastern had actual notice of Arbor Marks pursuant to the License and communications with Eastern.

61. Bravo and Eastern's conduct constitutes common law trademark infringement of the Arbor Marks.

62. Bravo and Eastern's use of the Arbor's Marks in connection with the sale of unauthorized products is likely to cause confusion in the marketplace, cause mistake or deceive Arbor's retail customers who have come to rely upon Arbor's distribution and sales strategy to ensure brand consistency and that Arbor products are only sold at high-end, quality retailers.

63. From its assumption of the License, Bravo knew that Arbor did not authorize the sale of Arbor products to Eastern or Ultimate. As a result, Bravo's

subsequent sale of Arbor products to Eastern and Ultimate, which constitutes an act of infringement, has been intentional and willful.

64. From at least March 1, 2017, if not earlier, Eastern knew that Arbor did not authorize Bravo's sale of Arbor products to Eastern, or Eastern's subsequent sale of those products. As a result, Eastern's continued sale of the unauthorized Arbor products, which constitutes an act of infringement, has been intentional and willful since that time, if not earlier.

65. Arbor seeks damages from this Court on the grounds that Bravo and Eastern have infringed, and continue to infringe, on the Arbor Marks.

### Prayer for Relief

Therefore, Arbor prays for judgment against Bravo and Eastern as follows:

1. For damages to compensate Arbor for past trademark infringement, including, but not limited to, profits earned by Bravo and Eastern as a measure of Arbor's damages and profits lost by Arbor as a result of Bravo and Eastern's actions;

2. For damages to compensate Arbor for Bravo and Eastern's willful and intentional trademark infringement;

3. For treble damages as a result of Bravo and Eastern's willful and intentional acts of infringement;

4. For attorney's fees and costs of suit; and

5. Other relief as this Court deems just and reasonable.

DATED: March 6, 2017

BUCHALTER
A Professional Corporation

By: _____/S/_____
MATTHEW L. SEROR
Attorneys for Defendant
ARBOR SNOWBOARDS, INC.

COMPLAINT
BN 28101702v1

## JURY TRIAL DEMAND

Plaintiff Arbor Snowboards, Inc. demands a trial by jury on all issues so triable in this matter.

DATED: March 6, 2017

BUCHALTER
A Professional Corporation

By: _____/S/_____
MATTHEW L. SEROR
Attorneys for Defendant
ARBOR SNOWBOARDS, INC.